**STATE OF RHODE ISLAND** **SUPERIOR COURT**
**PROVIDENCE, SC.**

**E.D. and D.D., individually and on behalf of their minor son, C.D.**
***Plaintiffs,***

v. **C.A. No.**
**JURY TRIAL CLAIMED**

**CITY OF PAWTUCKET, by and through its Treasurer, IRINA GORMAN**
**STATE OF RHODE ISLAND,**
**DEPARTMENT OF EDUCATION**
**JOHN AND JANE DOES 1-10, individually and in their official capacities;**
**FIRST STUDENT MANAGEMENT, LLC, and**
**FIRST STUDENT, INC.**
*Defendants.*

# COMPLAINT

## *Parties*

1. Plaintiffs E.D. and D.D. are the parents and next friends of minor C.D., now eight years of age.

2. C.D., at all times relevant to this complaint, has been deemed a child with a disability, entitled to entitled to reasonable accommodations for his disability pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 as well as the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.,* as well as special education services under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq*.

3. Plaintiffs and C.D at all times relevant to this complaint resided within the City of Pawtucket.

4. Defendant City of Pawtucket ("Pawtucket") is a municipal corporation duly organized under the laws of the State of Rhode Island and is sued by and through its Treasurer, Irina Gorman.

5. Defendant City of Pawtucket, as C.D.'s town of residence, is responsible for providing C.D. with an education under state and federal law, including transportation to and from school.

6. John and Jane Does 1-10 are sued in their individual and official capacities.

7. Plaintiffs have duly served the City Council of the City of Pawtucket with notice of their claim as mandated by R.I. General Laws. § 45-15-5, but have received no satisfaction.

8. Defendant Rhode Island Department of Education ("RIDE") is a state agency established under Rhode Island General Laws Title 16, Chapter 97, responsible for overseeing public education within the State of Rhode Island.

9. RIDE administers and operates the Statewide Transportation System, which among other things provides transportation services to the local education agencies such as the Town of Pawtucket, which has placed children out of district due to special education needs.

10. Defendant First Student Management, LLC is a limited liability company duly organized under the laws of the State of Delaware, with a principal office in Ohio.

11. Defendant First Student, Inc. is a business corporation duly organized under the laws of the State of Delaware, with a principal office in Ohio.

12. Defendants First Student Management, LLC and Defendant First Student, Inc. (collectively, "First Student") at all times relevant hereto provided transportation to and from C.D.'s special education placement at Strides Academy.

## ***Factual Allegations***

13. C.D. has a history of development delays, and has been diagnosed with ADHD and autism.

14. Pawtucket found C.D. eligible for special education services in June, 2022.

15. Despite his disabilities, C.D. is a highly intelligent child, and is capable of mastering the general curriculum.

16. During the school year 2022-2023, C.D. was in a pre-kindergarten program operated by Pawtucket.

17. The pre-kindergarten program had a teacher, and a support, and there were few if any transitions.

18. Over the summer of 2023, C.D. attended Pawtucket's half-day kindergarten "jump-start program," which was aimed at preparing for kindergarten and familiarize them with the routines of kindergarten in advance of the school year.

19. The parents had requested Extended School Year special education services, but were told that C.D. did not qualify because C.D. had no academic needs.

20. C.D. qualified for ESY because of his need for a structured program to prevent behavioral regression.

21. While C.D. attended the kindergarten "jump start" program, he exhibited behavioral challenges, especially during transition.

22. During C.D.'s attendance at the kindergarten "jump start" program, one behavioral technician violated regulations by requiring C.D. to stand facing the wall with his hands up, in order to shame him for behavioral challenges related to his disability.

23. The kindergarten involved many more transitions, which were known to trigger behavioral problems.

24. Not only did the kindergarten have more transitions, but it was also a full-day program.

25. The kindergarten also had only one teacher, with no additional adult to provide support.

26. Pawtucket was thus aware that C.D. would require additional accommodations and modifications to support his ability to access his education in the general classroom in kindergarten, but his IEP failed to provide them.

27. Linda Gifford, the Director of Pawtucket's Early Childhood Education program, assured the Plaintiffs that C.D. would receive the same supports in kindergarten that he had received in the pre-kindergarten program.

28. However, when C.D. began his kindergarten year in the general education classroom at Curtis Elementary School in September, 2023, Curtis staff was unaware that C.D. had an IEP.

29. On the first day of kindergarten, the school principal stated to Plaintiffs that they needed to talk about his behavior.

30. The Plaintiffs pointed out that C.D. had an IEP, and the principal stated that he was unaware.

31. About six days after school started in September, 2023, the parents were informed that C.D.'s records were lost.

32. Pawtucket thus failed to provide the accommodations and modifications that C.D. needed.

33. Pawtucket continued to fail to provide accommodations and modifications that C.D. needed.

34. Among the accommodations and modifications that C.D. needed was additional support in the classroom.

35. As a result of this failure to provide appropriate accommodations, C.D.'s behavior deteriorated.

36. C.D.'s behavior included eloping from the building, hiding under tables and refusing to come out, yelling, and screaming.

37. Beginning in about the first week of school in September, 2023, Plaintiff's parents were being summoned to the school on a near-daily basis to pick up C.D. from school early due to his becoming dysregulated, thus depriving him of access to education.

38. By September 12, 2023, the parties agreed that C.D. needed a new IEP.

39. On or about October 5, 2023, C.D.'s teacher wrote an email complaining about C.D.'s behavior, which included throwing crayons and stabbing her with a pencil.

40. In fact, the teacher had attempted to grab a pencil from C.D.'s hand, and when C.D. reacted, the teacher was accidentally stabbed.

41. E.D. then turned to Pawtucket School Committee member Kimberly Grant for support.

42. On or about October 10, 2023, Grant reached out to Special Education Director Mark Andrade.

43. On October 13, 2023, Pawtucket convened an IEP meeting, which included Andrade.

44. During the October 13, 2023, IEP meeting, C.D.'s placement was changed to a self-contained classroom at Curvin Elementary School.

45. In the meantime, Plaintiffs had continued to be summoned to the school on a near-daily basis to retrieve C.D.

46. Plaintiffs believed that a self-contained placement was too restrictive for C.D., but accepted this because of their grave concerns about C.D.'s safety.

47. Pawtucket verbally told the Plaintiffs that C.D. would be spending the majority of his time in the regular classroom.

48. Pawtucket verbally represented to Plaintiffs that C.D.'s IEP would reflect a self-contained placement because that room would be C. D.'s base.

49. C.D. presented with even more behavioral issues in the self-contained classroom because he was imitating the behaviors of children with lesser functional ability, and also because the academic work was below his level.

50. By November, 2023, Pawtucket returned C.D. to a general education classroom because his academic abilities could not be supported in the self-contained classroom.

51. Pawtucket nevertheless still failed to provide C.D. with the supports needed to access his education in the general education classroom.

52. As a direct result, C.D. continued to experience behavioral challenges, to the point where throughout the school year 2022-2023, he was placed in what was referred to as a "work room," which was actually a "seclusion room."

53. The seclusion room had a door casing, tile wall, brick walls, a gym mat on the floor, and no door.

54. The doorway to the room would be blocked by a gym mat.

55. C.D.'s confinement to the seclusion room triggered the provisions of the Physical Restraint Regulations promulgated by the Rhode Island Council on Elementary and Secondary Education, 200-RICR-20-30-2.1 *et seq.* ("Restraint Regulations").

56. The Restraint Regulations apply to every Rhode Island public school student, whether they are receiving special education under the IDEA, accommodations and modifications under Section 504, or neither.

57. The Restraint Regulations impose conditions upon which a student can be physically restrained. Physical restraint can only be applied where:

a. Non-physical interventions would not be effective; and

b. The student's behavior poses a threat of imminent, serious, physical harm to self and/or others; and

c. If a behavioral intervention plan has been developed for the student, those various positive reinforcement techniques have been implemented appropriately and the child has failed to respond to those reinforcement techniques.

200 R.I. Code R. 20-30-2.4

58. Moreover, the Restraint Regulations come with stringent provisions as to what is to take place after a restraint has taken place, including a report that includes:

> A description of the activity in which the restrained student and other students and staff in the same room or vicinity were engaged immediately preceding the use of physical restraint/crisis intervention, the behavior that prompted the restraint, the efforts made to deescalate the situation, alternatives to restraint that were attempted, and the justification for initiating physical restraint/crisis intervention;

200 R.I. Code R. 20-30-2.7.

59. Furthermore, after a restraint has taken place, ". . . school personnel shall determine if the student requires a behavioral intervention plan as part of the student's education program, and if one already exists, whether that plan needs to be modified or adjusted." 200 R.I. Code R. 20-30-2.7.

60. Pawtucket failed to provide consistently reports regarding the restraint to the Plaintiffs or otherwise comply with the Regulations.

61. As a result of Pawtucket's failure to provide said accommodations and modifications, as well as the failure to adhere to the Regulations, C.D. continued to be contained in the seclusion room multiple times throughout the 2023-2024 school year and/or otherwise restrained.

62. C.D. would be sent to the seclusion room for behaviors that did not impose a danger to himself, others, such as tipping over a chair, or withdrawing his hand into his sleeve and flapping the empty sleeve around and hitting someone with the empty sleeve.

63. In May-June, 2024, C.D. was denied access to a field trip to the fire station because the teacher expressed concerns about safety.

64. Pawtucket had a duty to provide appropriate accommodations and modifications to allow C.D. to attend the field trip, but excluded C.D. instead of providing said appropriate accommodations and modifications.

65. Pawtucket once again denied C.D. ESY services for the summer of 2024, citing C.D.'s lack of academic needs.

66. In July, 2024, C.D. was attending a summer program at Curvin Elementary.

67. After two days, C.D. sustained a concussion while attending the summer program.

68. During C.D.'s first grade year, school year 2024-2025, Pawtucket continued to fail to provide appropriate accommodations and modifications, as well as the failure to adhere to the Regulations, C.D. continued to be contained in the seclusion room multiple times school year and/or otherwise restrained.

69. On several occasions during these restraints, C.D. incurred scratches from the Velcro on the gym mats used to block the doorway of the seclusion room.

70. E.D. communicated with the School Committee member once again regarding the failure to provide modifications, but nothing was changed, and C.D. continued to be restrained and/or sent to the seclusion room.

71. During an IEP meeting in October, 2024, Pawtucket agreed to provide a 1:1 aide to support C.D. in the general education classroom.

72. By December, 2024, Pawtucket had still failed to provide the 1:1 aide as promised.

73. In December, 2024, C.D. was not allowed to go to the bathroom unaccompanied.

74. On or about December 16, 2024, C.D. had a bathroom accident because there was no one available to take him to the bathroom.

75. Plaintiffs once again reached out to a school committee member, and the 1:1 aide was hired in January, 2025.

76. The 1:1 aide was not trained in autism or proper supports, but was simply given a walk-talkie and instructed to call behavior technicians when C.D needed interventions.

77. Plaintiffs specifically requested training for the 1:1, but none was provided.

78. C.D. continued to be placed in the seclusion room and incur injury due to lack of appropriate supports.

79. On or about March 3, 2025, C.D. fell backwards while contained in the seclusion room, incurring further injury.

80. Finally, in the spring of 2025, Pawtucket convened another IEP, during which Pawtucket agreed to place C.D. in an out-of-district setting, the Strides Academy ("Strides").

81. C.D. began attending Strides at the end of May, 2025.

82. C.D. was transported to Strides through Statewide.

83. C.D. was scheduled to start at Strides a week earlier than he actually did, but that did not happen because the District and Statewide failed to arrange transportation.

84. Another child, "Jose," also attended Strides.

85. During the period of May 29, 2025 – June, 2025, Jose exposed himself on the bus to school.

86. C.D. did not report this incident to the parent at the time because he thought that Jose was just being "weird."

87. The monitor was at the front of the bus with the driver when Jose exposed himself, and was not supervising the students.

88. C.D. began his second grade year at Strides in September, 2025.

89. On September 4, 2025, C.D. came off the bus at the end of the school day, and reported to this parents that he had been sexually assaulted by Jose.

90. Jose kissed C.D. and put his tongue in C.D.'s mouth.

91. Jose had pulled down C.D.'s pants, and kissed C.D.'s private part over C.D.'s underwear, then asked C.D. to do it to him.

92. Jose threatened to beat C.D. up if he told anyone.

93. Said sexual assault was the direct result of Statewide/First Student's continued failure to supervise the students.

94. Plaintiffs immediately reported the incident to Statewide, Strides, and Pawtucket, as well as the Rhode Island Department of Children, Youth and Families, as well as the Pawtucket and East Providence Police Department.

95. Strides assured the Plaintiff that Jose was not going to be permitted back to school until his bus was changed, thus keeping him away from C.D.

96. On or about September 8, 2025, based on the promises of Strides, C.D.'s parents put him on the bus to school.

97. On or about 11:40 on September 8, 2025, the parents were contacted by First Student with a new schedule for C.D.

98. Plaintiffs immediately objected because they believed that it was wrong to make C.D. change his schedule when he was the victim, and that the new schedule would require him to spent an hour on the bus in the morning, and over an hour on the bus in the afternoon.

99. The Plaintiffs immediately contacted Strides, who told them that they needed to call Pawtucket.

100. Plaintiffs reached out to Pawtucket, who told them that they had asked First Student to make sure that C.D.'s schedule limited him to less than an hour on the bus each way, but stated that they could not request that Jose be kept off the same bus as C.D.

101. In the late afternoon, E.D. explained to First Student that C.D.'s schedule was changed after he had been sexually assaulted by Jose, and that she wanted Jose not to be on the same bus, and that C.D. receive a schedule comparable to the one that he had had.

102. The First Student representative stated that they had received no information about any assault, but simply had received a request to keep the two students off the same bus, and that C.D. had been the easiest to remove.

103. After the parents complained, they were told that C.D. was to be kept on the same schedule.

104. However, on September 12, 2025, the Plaintiffs were informed that Statewide was requiring C.D. to wear a harness on the bus.

105. The harness was referenced in C.D.'s IEP prior to the time he went to Strides, but since he transferred to Strides, C.D. had not been required to wear a harness.

106. The demand that C.D. wear a harness was in retaliation for the parents' complaint of sexual harassment and assault.

107. The parents strenuously objected to requiring C.D. to wear a harness because he had just been sexually assaulted, and was remaining on the same bus, with the same personnel that had failed to supervise him.

108. The parents objected to the harness at the September 17, 2024 IEP meeting, but it took at least another week before Statewide removed the requirement that C.D. wear the harness.

109. In the meantime, C.D. missed school because the parents were unable to take him to school.

110. Furthermore, although C.D. was supposedly kept on the same schedule, he was given an extended route.

111. The extended route required C.D. to spend over an hour traveling to school each morning, and be late arriving to school.

112. C.D. continued on this extended route until his parents filed a complaint with the Rhode Island Department of Education.

113. Since the sexual assault, C.D. has been bullied by another child, "Jeremiah."

114. Jeremiah repeatedly hit C.D. over the back of the seat, taken and thrown C.D.'s property, and threated C.D.

115. At the time that Jeremiah was doing these things, the monitor was sitting beside Jeremiah but failed to take action.

116. Jeremiah was only removed from the bus after C.D.'s parents complained to Pawtucket.

117. Jeremiah had been joined by a friend, Mason, in the bullying.

118. On or about March 24, 2026, C.D. was assaulted by Mason while being transported by Statewide, this time by strangulation, causing C.D. further injury.

119. The staff on the bus reported that they had been afraid to intervene because Statewide forbade them to touch a student.

**COUNT I**
**SECTION 504 OF THE REHABILITATION ACT and AMERICANS WITH DISABILITIES ACT**
**(Hostile Environment/Failure to Provide Accommodations)**

120. Plaintiffs re-allege those averments contained in the Paragraphs above as if fully re-stated herein.

121. The Americans with Disabilities Act prohibits discrimination on the basis of disability and further prohibits retaliation for the exercise of protected conduct, including advocacy for the rights of individuals with disabilities.

122. Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability and further prohibits retaliation for the exercise of protected conduct, including advocacy for the rights of individuals with disabilities.

123. The Defendant, City of Pawtucket, receives federal financial assistance, as defined by 29 U.S.C. § 794, and, as such, may not discriminate against a person because of disability, nor may it retaliate against individuals who advocate for the rights of individuals with disabilities.

124. The Defendant, City of Pawtucket , is a "public entity" as defined in 42 U.S.C. § 12131(1), and receives federal financial assistance so as to be covered by the mandates of the ADA.'

125. C.D. was a qualified individual with a disability pursuant to both Section 504 and the ADA.

126. Pursuant to Section 504 and the ADA, C.D.. had a right to be free of discrimination and harassment based upon his disability, and also had the right to accommodations based upon his disability.

127. The City of Pawtucket failed to provide accommodations for C.D.'s disability.

128. Due to the inaction of the City of Pawtucket, C.D. was subjected to harassment and discrimination based upon his disability by staff members.

129. Said harassment and discriminatory treatment was so severe and pervasive, and objectively offensive that it denied C.D. equal access to his education.

130. Defendant City of Pawtucket had actual knowledge of said harassment, but were deliberately indifferent to the same in that they failed to take effective action to stop the harassment and discrimination.

131. As a direct and proximate result of the wrongful actions of Defendant City of Pawtucket, C.D. suffered physical injury and other non-pecuniary losses.

132. Said actions of Defendant City of Pawtucket were done with conscious disregard to Plaintiffs' legal rights.

WHEREFORE, Plaintiffs demand judgment against Defendant City of Pawtucket including but not limited to injunctive relief, nominal damages, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

**COUNT II**
**SECTION 504 OF THE REHABILITATION ACT and AMERICANS WITH DISABILITIES ACT**
**(Retaliation)**

133. Plaintiffs re-allege those averments contained in the Paragraphs above as if fully re-stated herein.

134. Section 504 of the Rehabilitation Act and the Americans with Disabilities Act prohibit retaliation for the exercise of protected conduct, including advocacy for the rights of individuals with disabilities.

135. Plaintiffs engaged in protected activity by advocating for the rights of their son, a student with a disability within the meaning of both Section 504 and the ADA, by advocating for appropriate and safe transportation services.

136. Plaintiffs' protected activity was a substantial or motivating cause of retaliatory action against them and C.D. by the Defendant Statewide.

137. Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability and further prohibits retaliation for the exercise of protected conduct, including advocacy for the rights of individuals with disabilities.

138. The Defendant, Statewide, receives federal financial assistance, as defined by 29 U.S.C. § 794, and, as such, may not discriminate against a person because of disability, nor may it retaliate against individuals who advocate for the rights of individuals with disabilities.

139. The Defendant, Statewide, is a "public entity" as defined in 42 U.S.C. § 12131(1), and receives federal financial assistance so as to be covered by the mandates of the ADA.'

140. This retaliation took the form of conditioning transportation services on C.D.'s wearing a physical restraint on the bus and changing his bus schedule so as to cause him to be late to school and spend excessive time on the bus.

141. As a direct and proximate result of the wrongful actions of Defendant Statewide, Plaintiffs have suffered financial harm, as well as emotional distress, personal inconvenience, worry, loss of enjoyment of life, and other non-pecuniary losses.

142. Said actions of Defendant Statewide were done with conscious disregard to Plaintiffs' legal rights.

143. Said actions of Defendant Statewide were wicked and wanton, and for the good of society must be punished.

WHEREFORE, Plaintiffs demand judgment against Defendant Statewide including but not limited to injunctive relief, nominal damages, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

**COUNT III**
**Negligence – City of Pawtucket**

144. Plaintiffs re-allege those averments contained in the Paragraphs above as if fully re-stated herein.

145. Defendant City of Pawtucket had a duty to exercise reasonable care in the supervision, custody, care, and education of C.D.

146. Defendant City of Pawtucket breached that duty by failing to take reasonable actions to prevent C.D. from suffering discrimination and harassment based upon his disability, as well as repeated assaults while on the bus.

147. As a direct result of the actions of Defendant City of Pawtucket, Plaintiffs have suffered and will continue to suffer financial harm, emotional distress, personal inconvenience, worry, loss of enjoyment of life, and other non-pecuniary losses.

148. Said actions of Defendants were done with conscious regard for the legal rights of Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendant City of Pawtucket, including but not limited to injunctive relief, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

**COUNT IV**
**Negligence – Statewide Transportation and First Student**

149. Plaintiffs re-allege those averments contained in the Paragraphs above as if fully re-stated herein.

150. Defendants State of Rhode Island, Statewide Transportation and First Student had a duty to exercise reasonable care in the supervision, custody, and care of C.D. while he was being transported.

151. Defendants State of Rhode Island, Statewide Transportation and First Student, by failing to take reasonable actions to prevent C.D. from suffering sexual harassment and assaults on the school bus.

152. As a direct result of the actions of State of Rhode Island, Statewide Transportation and First Student, Plaintiffs have suffered and will continue to suffer financial harm, emotional distress, personal inconvenience, worry, loss of enjoyment of life, and other non-pecuniary losses.

153. Said actions of Defendants were done with conscious regard for the legal rights of Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendants State of Rhode Island, Statewide Transportation and First Student, including but not limited to injunctive relief, nominal, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

**COUNT V -- VIOLATION OF TITLE IX, 20 U.S.C. § 1681, *ET SEQ.***

154. Plaintiff realleges those allegations contained in the Paragraphs above as if fully restated therein.

155. C.D. was subjected to harassment based on his sex/gender in the form of unwanted sexual attention.

156. Said harassment was so severe, pervasive, and objectively offensive that it deprived C.D. of access to educational opportunities offered by the Pawtucket public schools.

157. Defendants failed to promptly and appropriately respond to the sexual harassment, to the point that C.D. was deprived of the educational opportunities offered by the Pawtucket public schools.

158. Defendants are recipients of federal assistance.

159. As a direct result of the actions and omissions of Defendants C.D. has suffered and will continue to suffer financial harm, emotional distress, personal inconvenience, worry, loss of enjoyment of life, loss of educational opportunities and other non-pecuniary losses.

160. As a direct result of the actions of Defendants, C.D. has suffered and will continue to suffer financial harm, emotional distress, personal inconvenience, worry, loss of enjoyment of life, loss of consortium, and other non-pecuniary losses.

161. Said actions of Defendants were done with conscious disregard for the legal rights of Plaintiff.

162. Said actions of Defendants were wicked, wanton, and for the good of society must be punished.

WHEREFORE, Plaintiffs demand judgment against Defendants, including but not limited to injunctive relief, nominal, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

**COUNT VI**
**TITLE IX -- RETALIATION**
**(Statewide)**

163. Plaintiffs re-allege those averments contained in the Paragraphs above as if fully re-stated herein.

164. Title IX prohibit retaliations for the exercise of protected conduct.

165. Plaintiffs engaged in protected activity by advocating for the rights of their son, who had experienced unwanted sexual attention on the bus.

166. Plaintiffs' protected activity was a substantial or motivating cause of retaliatory action against them and C.D. by the Defendant Statewide.

167. This retaliation took the form of conditioning transportation services on C.D.'s wearing a physical restraint on the bus and changing his bus schedule so as to cause him to be late to school and spend excessive time on the bus.

168. As a direct and proximate result of the wrongful actions of Defendant Statewide, Plaintiffs have suffered financial harm, as well as emotional distress, personal inconvenience, worry, loss of enjoyment of life, and other non-pecuniary losses.

169. Said actions of Defendant Statewide were done with conscious disregard to Plaintiffs' legal rights.

170. Said actions of Defendant Statewide were wicked and wanton, and for the good of society must be punished.

WHEREFORE, Plaintiffs demand judgment against Defendant Statewide including but not limited to injunctive relief, nominal damages, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

**COUNT VII**
**(Rhode Island Civil Rights Act)**

171. Plaintiffs re-allege those averments contained in the Paragraphs above as if fully re-stated herein

172. Rhode Island Gen. Laws § 42-112-1 *et seq*. provides, in pertinent part:

> All persons within the state, regardless of race, color, religion, sex, disability, age, or country of ancestral origin, have, except as is otherwise provided or permitted by law, the same rights to make and enforce contracts, to inherit, purchase, to lease, sell, hold, and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, and are subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

173. C.D. is a disabled person and has a disability covered by R.I.G.L. § 42-112-1 *et seq*.

174. C.D. had a right to receive the full and equal benefit for all laws and proceedings for the security of persons and property, including the right to be free from unlawful restraint, the right to a safe school environment, the right to be free from assault, and the right to a school environment free of sexual harassment.

175. Defendants, by their individual and concerted acts and omissions, including, but not limited to, those described herein, discriminated against C.D.. based upon his disability and sex.

176. Defendants' actions were outrageous, wicked and wanton, and for the good of society must be punished.

WHEREFORE, Plaintiffs demand judgment against Defendants, including but not limited to injunctive relief, nominal, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

**COUNT VIII**
**(Rhode Island Civil Rights for Persons with Disabilities Act)**

177. Plaintiffs re-allege those averments contained in the Paragraphs above as if fully re-stated herein.

178. C.D. is a disabled person and has a disability covered by R.I.G.L. § 42-87-1 *et seq*.

179. The First Student Defendants are entities doing business in the state, is regulated by the state, and is operating a program regulated by and receiving financial assistance from the state, as defined in R.I.G.L. § 42-87-2 *et seq*.

180. The remaining Defendants are regulated by the state, and is operating a program regulated by and receiving financial assistance from the state, as defined in R.I.G.L. § 42-87-2 *et seq*.

181. Defendants, by their individual and concerted acts and omissions, including, but not limited to, those described herein, discriminated against C.D.. based upon his disability.

182. C.D. was denied the benefits of his educational program and transportation, based upon his disability.

183. Defendants' actions were outrageous, wicked and wanton, and for the good of society must be punished.

WHEREFORE, Plaintiffs demand judgment against Defendants, including but not limited to injunctive relief, nominal, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

Plaintiffs,
By their attorney,

/s/ Vicki J. Bejma
Vicki J. Bejma #6498
Robinson & Clapham
123 Dyer Street, Suite 135
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
vbejma@smrobinsonlaw.com